IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| | \* | |
| v. | \* | Criminal No. SAG-20-0056 |
| | \* | |
| **RANDY OWENS** | | |
| | \*\*\*\*\*\*\* | |

## MEMORANDUM OPINION

On February 13, 2020, a grand jury returned an indictment against Randy Owens for a violation of 18 U.S.C. § 922(g)(1) (possession of a firearm and ammunition by a convicted felon). ECF 1. Currently pending is Owens's "Emergency Motion for Review of Detention Order" ("the Motion"), ECF 16, which seeks reconsideration of the detention order this Court entered on February 24, 2020. ECF 13. Upon review of the Motion, this Court ordered Owens's medical records, and requested supplemental briefing and information, which has been filed by both parties. ECF 17, 18, 22, 23, 25, 26. In light of the extensive record before me, no additional hearing is necessary to resolve this Motion. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Owens's Motion will be denied.

**I.    Procedural History**

Upon Owens's initial appearance in court on February 19, 2020, the government sought his pretrial detention. United States Magistrate Judge Deborah L. Boardman held a detention hearing on February 24, 2020, and ordered Owens's release on conditions. ECF 9, 10. The government immediately sought a stay of Judge Boardman's Order, and filed an appeal to this Court. ECF 11. Following another detention hearing later that same day, this Court found by clear and convincing evidence that no condition or combination of conditions could ensure community

safety if Owens were to be released, and ordered his pretrial detention.[1]  ECF 12, 13.  Since that time, Owens has been held primarily at two adjoining facilities in Washington, D.C.: the Central Detention Facility ("the DC Jail") and the Correctional Treatment Facility ("CTF").

On April 22, 2020, Owens filed the instant Emergency Motion for review of his detention order, citing changed circumstances presented by the COVID-19 pandemic and his own health concerns. ECF 16.

## II.    Standard of Review

Pretrial detention and release are governed by the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141, *et seq.*  The government is permitted to seek pretrial detention of a defendant charged with the alleged possession of a firearm.  *Id.* § 3142(f)(1)(E).  The BRA instructs the Court to seek "the least restrictive further condition or conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  *Id.* § 3142(c)(1)(B).  However, if the Court finds after the hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order the detention of the person before trial."  *Id.* § 3142(e)(1).  Where, as here, a detention ruling is based on a defendant's danger to the community, the Court must make the finding by clear and convincing evidence.  *United States v. Stewart,* 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam).

The Court's determination is governed by four factors:

(1)    The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a Federal crime

---

[1] On March 9, 2020, Owens's counsel filed a Notice of Appeal of the detention decision.  ECF 15. However, the notice was not transmitted to the Court of Appeals for the Fourth Circuit, as a result of apparent administrative error.  Owens is entitled, if he wishes, to refile his notice of appeal in light of the unfavorable ruling made herein.

2

>   of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;
>
> (2) The weight of the evidence against the person;
>
> (3) The history and characteristics of the person, including –
>
>    (A) The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>    (B) Whether, at the time of the current offense or arrest, the person was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## III. Analysis

In the Motion, Owens seeks reconsideration of this Court's detention order under § 3142(f) and (g). ECF 16. In the alternative, Owens also asks this Court to consider his temporary release under § 3142(i). *Id.* This Court will address each argument in turn.

At the outset, however, it is important to review the overall framework of the detention issues presented to the Court, and the impact of COVID-19 and the conditions within CTF, on each issue. As described above, when considering whether there are any conditions of pretrial release "that will reasonably assure" a particular defendant's appearance in court, and the safety of the community, 18 U.S.C. § 3142(f), Congress carefully prescribed four factors that a court must consider, *id.* § 3142(g). None of those factors refers specifically to whether the conditions of incarceration threaten the defendant's well-being. Instead, Congress focused the required inquiry on the defendant's risk of nonappearance, and the danger that the defendant's release

3

would pose to other individuals. In some circumstances, clearly, a particular defendant's medical condition could reduce that defendant's risk of flight or danger to the community, and the health condition would therefore fall within the factors appropriately considered in the context of § 3142(g). Absent those circumstances, however, a particular defendant's health conditions, and the possible risks posed to the defendant by incarceration, do not impact the § 3142(f) and (g) analysis. *See, e.g.*, *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) ("A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm *to the defendant* does not usually bear on this analysis."); *United States v. Lawton*, Crim. No. CR419-102, 2020 WL 1984897, at *1 (S.D. Ga. Apr. 27, 2020) (same); *United States v. Whyte*, Crim. No. 3:19-cr-64-1 (VLB), 2020 WL 1911187, at *4 (D. Conn. Apr. 8, 2020) (analyzing medical conditions under § 3142(i)); *United States v. Aguirre-Maldonado*, Crim. No. 20-cr-53 (NEB/TNL), 2020 WL 1809180, at *1 (D. Minn. Apr. 9, 2020) ("While the Court appreciates the unprecedented nature of the COVID-19 pandemic, Defendant has offered no reason why the pandemic would reduce his risk of nonappearance or the risk that he poses to the community.").

However, as will be discussed below, the COVID-19 pandemic is relevant in the assessment of whether a defendant's temporary release might be appropriate under § 3142(i), and will be considered fully in that context, in accordance with the Fourth Circuit's order in *United States v. Creek*, Criminal No. CCB-19-036, ECF 402 (Apr. 15, 2020) (directing the District Court to consider "in the first instance the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility

where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i).").

### A. Reconsideration of the Initial Detention Decision

Taking into account the nature of the charges against Owens, the weight of the evidence, and Owens's history and characteristics, including his current medical conditions, this Court remains persuaded that Owens would pose a grave danger to the community if released. Moreover, this Court concludes that no release condition or combination of conditions would reasonably assure the safety of the community pending trial, and that Owens's continued detention is accordingly warranted.

The analysis begins with the nature and circumstances of the charged offense. Owens was arrested on the streets of Baltimore City with an Uzi assault-style weapon, loaded with thirty-one rounds of ammunition. It is difficult to overstate the danger that such a high-capacity firearm poses to the community, particularly in a city overrun with gun violence, even during the current pandemic and associated stay-at-home orders. *See* Justin Fenton, *Baltimore Crime During Coronavirus: Property Crime Plummets, Gun Violence Continues,* Balt. Sun (Apr. 4, 2020 5:00 a.m.), https://bit.ly/3e8WT43.

The facts underlying Owens's arrest also highlight the danger he poses. Officers with the Baltimore Police Department received information from a confidential source, indicating that an individual located in the 600 block of North Edgewood Street in Baltimore City could be armed with a handgun concealed in a striped bag. The officers proceeded to that block and located a person matching the description provided by the confidential source, including the striped bag. The suspect watched the officers, through the window of a parked vehicle, as the officers drove down the street. The officers circled the block, and when they returned to the location, the suspect

was standing on the porch of a residence. One of the officers approached the suspect and asked him to approach the officer. The suspect walked off the front porch of the residence toward the sidewalk. As the officer approached, the suspect fled on foot, carrying the striped bag. Following a brief foot chase, officers apprehended the suspect, who they later identified as Owens. A subsequent search of the striped bag resulted in the recovery of an IMI Uzi 9mm semiautomatic pistol, loaded with 31 rounds of ammunition. The officers' body-worn camera captured the event. While in custody, Owens made a recorded jail call in which he admitted to possessing a gun when he was arrested.

Owens's criminal history compounds the serious risk he poses to the community. In 2013, at just the age of twenty, Owens was convicted of conspiracy to commit armed robbery, as well as possession with intent to distribute controlled dangerous substances. He received a seven year prison sentence. Just one year later, in 2014, Owens was convicted of another possession with intent to distribute charge he had incurred in 2012, and received a concurrent sentence. Owens was eventually released on mandatory supervised release in December, 2018. The events giving rise to Owens's instant arrest occurred just seven months after his release from state prison, while Owens was on supervised release. In short, despite being 27 years of age, Owens has already exhibited a pattern of drug trafficking and gun-related offenses, and an inability or unwillingness to comply with release conditions.

Relevant to this case, Owens reported to Pretrial Services that, with the exception of his long period of incarceration, he had lived with his mother (the proposed third-party custodian) and his stepfather since 2008. While, at Owens's initial detention hearing, this Court did not consider the substantive nature of Owens's juvenile adjudications for the purposes of assessing the danger he presents to the community, it is relevant that his juvenile records indicated,

6

> According to the Department of Juvenile Services records, the defendant's adjustment to community supervision was unsatisfactory. Records indicate that during the juvenile supervision period of December 12, 2011 to February 2, 2012, the defendant failed to disclose his address; failed to comply with appointments for GPS hookup; and failed to comply with instructions of the supervising officer. As a result, a warrant was issued for the defendant and according to records, the defendant failed to comply with instructions to surrender to the warrant.

In combination with his arrest for possession of a loaded Uzi while on supervised mandatory release from a state court, Owens's record of compliance with court-imposed release conditions is not a good one.

As noted below, as part of the history and characteristics of the defendant, this Court has considered Owens's medical condition, and has reviewed his medical records from the detention facility. Although Owens alleges that he suffered from asthma as a child, he has not provided any contemporaneous medical records to substantiate that assertion. This Court is sensitive to the possibility that an individual may not have had the resources to seek a formal medical diagnosis, or to obtain specific treatment. However, Owens's more recent omissions of his history of asthma are particularly concerning. He does not suggest that he has had adult treatment for asthma. At his interview with Pretrial Services, Owens stated that he is "in good physical health, but noted he has a hernia for which he is prescribed pain medication." His mother verified that description of his health as accurate. Medical records at CTF reflect that Owens did not report asthma (or any history of asthma) to the facility when asked about his medical history at intake on February 19, 2020. ECF 27-2 at 12 (noting for Asthma History, "Hx Asthma: no"). He reported "that he is coming to DC DOC facility from Jessup Maryland Prison." *Id.* at 16.

On March 26, 2020, Owens complained of an occasional cough. *Id.* at 21–22. After a thorough examination, he was placed in a single cell. *Id.* at 23. On March 31, 2020, Owens placed a sick call "to see the suboxone provider," alleging withdrawal, and an appointment was scheduled

7

with that provider for a later date. *Id.* On April 4, 2020, Owens was placed in quarantine after possible exposure to a confirmed COVID-19 case. *Id.* at 26. He was afforded a medical assessment in quarantine, and reported that he was "feeling well today and denies cough, fever/chills, chest pain, body aches, headache and SOB [shortness of breath]." *Id.* ███████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

On April 15, 2020, Owens was seen in urgent care with a history of two days of coughing, complaints of fatigue, and a slight fever (99 degrees). *Id.* at 44. He received a COVID-19 test, and acetaminophen. *Id.* at 45. He was examined for follow-up twice the next day, but reported that he was "improved" and "doing fine." *Id.* at 45-49. During another follow-up examination on April 17, 2020, Owens again reported "no issues or concerns at this time," and was "only concerned [with] when he will be able to leave cell restriction." *Id.* at 48-51. Later that day, however,

---

2 ███████████████████████████████████████████████
███████████████████████████████ The Pretrial Services Report also reflects that Owens had been held without bond in state custody beginning on July 24, 2019, and was transferred from state custody into the custody of the United States Marshals Service.

Owens's test results revealed that he was positive for COVID-19. *Id.* at 53. When informed of the results, Owens reported "he is feeling better and denies any current symptoms." *Id.* He was moved to isolation as a result of his positive test.

The medical records demonstrate that Owens suffered mild symptoms, including a slight fever (which never exceeded 99 degrees), and a cough that persisted for a few days. *See, e.g.*, *id.* at 48 ("[P]atient denies any cough today. [S]tates that he feels fine. [N]o cough since he was tested."); *id.* at 50 ("Pt. only concerned [with] when he will be able to leave cell restriction."); *id.* at 55 (stating that Owens "denies having any concerns at this time"); *id.* at 56 ("[H]e is feeling well overall . . . current symptoms: None"); *id.* at 58 (stating that "pt reports he continues to feel well . . . current symptoms: asymptomatic"); *id.* at 60 ("He has no complaints and states he feels well."); *id.* at 61 ("Doing well, asymptomatic, symptoms resolved 4/15. If he continues to be asymptomatic he could be discharged 7 days after resolution of symptoms."); *id.* at 63 ("[R]eports he isn't having any symptoms. Feels well . . . Asks, 'when can I get out?'"). Owens remained in isolation for seven days after his symptoms subsided, and was released from isolation, after receiving what appeared to be appropriate and successful medical care, on April 22, 2020. *Id.* at 73. Fortunately, throughout his time in isolation, Owens reported being asymptomatic and denied experiencing shortness of breath. *Id.* at 70. In addition, during the entire course of his treatment for COVID-19, Owens never told his treating medical sources about any history of asthma.

Instead, Owens first mentioned asthma in a sick call slip the day after his discharge from isolation, April 23, 2020, immediately following the filing of the instant motion on April 22, 2020. *Id.* at 81. Upon examination on April 26, 2020, Owens reported "some intermittent chest tightness" following his recent diagnosis of COVID-19, and first reported a history of childhood

asthma. *Id.* at 77. Medical staff prescribed Owens a rescue inhaler to use as necessary, and suggested that he follow up as needed. *Id.*

This Court is not persuaded that Owens's history of childhood asthma, his recent bout with, and recovery from, COVID-19, or his intermittent chest tightness decreases the danger he poses to the community upon release. In particular, according to the history Owens provided, he had been diagnosed with asthma well before his serious criminal convictions and his alleged possession of a loaded high capacity, assault-style weapon in this case. Owens's medical circumstances therefore do not alter this Court's view that, considering the factors in § 3142(g), there is no condition or combination of conditions that can adequately assure the safety of the community if Owens were to be released pending trial.

      **B.**      **Request for Temporary Release Pursuant to § 3142(i)**

Section 3142(i) permits "the temporary release of the person, in the custody of a United States marshal or other appropriate person, to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." Owens's case, like all criminal cases, has been postponed by this Court's most recent Standing Order canceling all non-emergency court proceedings through June 5, 2020, and the delay occasioned by the pandemic has been excluded under the Speedy Trial Act. *See* Standing Order 2020-07, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19,* Case No. 1:00-mc-00308 (D. Md. April 10, 2020). Thus, at least at this time, temporary release is not justified on the basis of a need to prepare his defense. When the Court is able to return to standard operations, Owens and his attorney will be afforded whatever time is necessary to confer and to prepare an adequate defense. Moreover, on April 23, 2020, Chief Judge James K. Bredar of this Court issued a COVID-19 related order, 20-mc-146, ECF 14, requiring that the DC

Department of Corrections forthwith "ensure that Maryland detainees have reasonable access to their counsel and that counsel have reasonable access to their detainee clients, via telephone at least." Thus, the Sixth Amendment rights of Maryland detainees at CTF will be protected, and there is no need for temporary release to allow for preparation of a defense.

This Court must also assess whether there is "another compelling reason" justifying temporary release under § 3142(i). Prior to the instant pandemic, this provision was "sparingly" used to justify temporary release for specific medical treatments, such as cancer surgery or chemotherapy. *See, e.g., United States v. Hamilton*, 2020 WL 1323036, at *3 (E.D.N.Y. Mar. 23, 2020). Courts have been considering and employing § 3142(i) in a more widespread fashion in the context of COVID-19. The well-reasoned opinion in *Clark*, 2020 WL 1446895, at *3, sets forth four factors to be considered: (1) the original grounds for detention; (2) the specificity of a defendant's COVID-19 concerns; (3) the extent to which the proposed release plan is designed to mitigate or exacerbate other COVID-19 risks to the defendant; and, (4) the likelihood that a defendant's release would increase the COVID-19 risks to others.[3] The Defendant bears the burden of establishing those factors. *See United States v. Sanders*, Crim. No. 19-20037-01-DDC, 2020 WL 1528621, at *3 (D. Kan. March 31, 2020). "The question for the Court is whether the COVID-19 health risks to the Defendant, should he remain detained, outweigh those traditional Section 3142(g) factors and the COVID-19 health risk to the community that Defendant's release could occasion." *United States v. Hernandez*, Crim. No. PX-19-158-9, slip op. at 5-6 (D. Md. Apr. 29, 2020), ECF 385.

---

[3] While *Clark* is not binding precedent, its persuasive and logical framework has been adopted by numerous courts around the country, including several in this District. *See, e.g.*, *United States v. Green*, No. 19-cr-00539-CCB, 2020 WL 1873967 (D. Md. April 15, 2020).

11

As described above, the original grounds for detention weigh strongly in the government's favor, due to the extreme risk Owens poses to community safety.

Moreover, the specificity of Owens's COVID-19 concerns do not weigh in favor of his temporary release. Owens's particular posture differs from that of the majority of detainees at CTF, in that he has already been diagnosed with and treated for COVID-19, with apparent success. This Court does not in any way intend to minimize the seriousness, and potential for severe complications, associated with any COVID-19 diagnosis. Indeed, no conclusive studies have yet established the extent of any immunity conferred by antibodies to the COVID-19 virus. However, Owens's infection with, and recovery from, the virus, without experiencing any serious or life-threatening symptoms, undermines his contention that he harbors a particular susceptibility to a severe course of illness as a result of his undocumented history of childhood asthma.

In addition to the inherent difficulty with maintaining social distancing in an incarcerative setting, Owens cites extensive information about the general conditions at his detention facility. As of May 2, 2020, public reporting reflects that, at CTF and the connected D.C. jail (collectively "CTF"), 140 detainees have tested positive for COVID-19: 49 are in isolation following a positive test; 88 (presumably including Owens) have recovered; and one detainee has died. *Public Safety Agency COVID-19 Case Data*, Gov't of D.C. (May 2, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data. A class action lawsuit on behalf of persons incarcerated at CTF was filed in the United States District Court for the District of Columbia. *See Banks v. Booth*, No. 20-849-CKK (D.D.C. Apr. 19, 2020). The lawsuit sought immediate release or transfer of those detained, contending that CTF's inadequate response to the COVID-19 pandemic violates the detainees' constitutional rights. The presiding United States District Judge, Colleen Kollar-Kotelly, appointed independent inspectors to provide a

comprehensive report and recommendations describing the conditions inside CTF, with respect to the safety of those incarcerated. *Id.*, ECF 47. Upon review of the inspectors' report, Judge Kollar-Kotelly issued a Temporary Restraining Order, requiring certain specific corrective action aimed at immediately improving the conditions of confinement at CTF. *Id.*, ECF 48. Even as of the date of the inspectors' report and recommendations, D.C.'s Department of Corrections ("DOC") had already taken steps towards implementing some of the reforms, as expressed in a memorandum attached to the inspectors' report.

Significantly, despite the findings in the inspectors' report, Judge Kollar-Kotelly did not order the release or transfer of any detainees or inmates, or any reduction in the overall population at CTF. *Id.*, ECF 49 at 26 ("The Court is not ordering the release of any inmates currently detained in DOC facilities."). Judge Kollar-Kotelly's continued monitoring of the litigation, as it moves from the posture of a Temporary Restraining Order to one considering the propriety of any further injunctive or other relief, might result in the imposition of further corrective measures. Additional steps she takes will likely depend on the DOC's compliance with the improvements she has ordered to date. Clearly, however, Judge Kollar-Kotelly and her team of experts and inspectors are in the best position to evaluate the overall conditions at the facility, and to monitor the protection of the constitutional rights of its detainees, including putative class members such as Owens. "Although the pendency of that action does not impede this Court from assessing Defendant's motion under the Bail Reform Act (which, necessarily, requires an individual assessment of Defendant's detention situation), some recognition of principles of comity is appropriate to promote the twin goals of avoiding 'an unnecessary burden on the federal judiciary' and preventing 'the embarrassment of conflicting judgment.'" *United States v. Hernandez*, Crim. No. 19-00158-PX, ECF 385 at 5 (Coulson, J.) (quoting *In re Naranjo*, 768 F.3d 332, 348 (4th Cir.

2014) and *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979)). Thus, it would be inappropriate for this Court to consider the situation at CTF more broadly, other than in the context of the simple application of the BRA to Owens.

Ultimately, as to the second *Clark* factor, the Court is not persuaded that Owens is presently at increased risk of serious complications from the COVID-19 virus, by virtue of his continued detention at CTF. Although Owens's alleged history of childhood asthma could theoretically increase his risk for serious complications if he is able to contract COVID-19 for a second time, his initial experience with the virus counsels against such a finding.

The final two *Clark* factors involve the nature of the proposed release plan, including the extent to which it is designed to mitigate Owens's exposure to the COVID-19 virus, and the risk that Owens's release would pose to the community. Owens advocates his release to "24/7 home detention with location monitoring." ECF 16 at 17. Unfortunately, as Owens concedes, that mechanism of monitoring, which is widely recognized to be the Court's best alternative to incarceration when close supervision of a defendant is warranted, is currently unavailable. Installation of an ankle bracelet cannot be accomplished without significant risk to the health and safety of a location monitoring specialist. *See Martin*, 2020 WL 1274857, at *4. The currently-available monitoring alternatives, such as SmartLink, VoiceID, and Home Incarceration by Phone, only offer periodic "spot-checks" as to the defendant's location, and cannot provide immediate notification to Pretrial Services if a defendant leaves his prescribed residence. Given the Court's inability to effectively monitor Owens, the degree to which release would protect him, and others, from virus exposure "depend[s] on large part on how compliant Defendant would be with the directives of public officials and health experts should he be released." *Green*, 2020 WL 1873967, at *3. Owens's prior history of failure to comply with court-imposed release conditions does not

suggest that his compliance could be assumed, particularly in the current period when Pretrial Services' monitoring abilities are constrained.

The Court is persuaded that Owens's risk of a second exposure to the virus could be mitigated by his release plan.  His proposed third-party custodian works as a nurse and would be well-prepared to care for Owens and to take the required precautions to protect herself and her family from exposure.  While the COVID-related aspects of the release plan are sound, the remaining aspects are not, given Owens's poor history of compliance with court-imposed release conditions while residing in the same residence, under the same supervision. Section 3142(i) contemplates release to a U.S. Marshal or other "appropriate person." The Court has significant concerns, based on Owens's prior compliance issues while living in that home, about whether his mother can constitute an "appropriate person" to supervise Owens's temporary release, despite her unquestionable experience managing COVID-19 health concerns.

In conclusion, most of the *Clark* factors weigh in favor of Owens's continued detention or are neutral, with the only exception being the fact that his release to his mother and stepfather's home would not pose a significant danger to any party's health, given his mother's nursing experience.  Ultimately, that factor is significantly outweighed by the strong evidence of Owens's possession of an Uzi loaded with thirty-one rounds on the streets of Baltimore, his prior conviction for conspiracy to commit armed robbery, and the fact that he was on conditions of supervision at the time he possessed the Uzi.  Even in light of the current pandemic, then, Owens has not met his burden to establish a compelling reason justifying his temporary release from pretrial detention.

## IV. CONCLUSION

For the reasons stated herein, Owens's Emergency Motion for Review of Detention, ECF 16, is DENIED.

Dated:  May 5, 2020                                                                  /s/
                                                                         Stephanie A. Gallagher
                                                                         United States District Judge